## DECLARATION

I am a Task Force Officer with the Drug Enforcement Administration and the agent assigned responsibility of this case. I have read the contents of the foregoing Verified Complaint for Forfeiture In Rem and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22 day of MAY, 2024.

_____
Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration

# AFFIDAVIT

Nicholas Nimeskern, first being duly sworn, deposes and says:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) in the Cincinnati Resident Office (RO) and have been since 2020.

2. I have been a police officer since 2005 and am currently employed with the City of Montgomery Police Department. I was previously assigned to D.A.R.T. Drug Abuse Reduction Task Force for several years prior to being assigned to the DEA. As a Task Force Agent with the DEA, my duties include the investigation of violations of federal law concerning the importation, manufacture, possession, and distribution of controlled substances as defined by Title 21, United States Code, Section 841 including controlled substances such as heroin, fentanyl, cocaine, methamphetamine, marijuana, illicitly diverted pharmaceuticals, and other dangerous drugs. During my current assignment with the DEA, I have specialized in investigations involving narcotics trafficking and numerous criminal offenses, including those involved in the current investigation. I have received specialized training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Since that time, I have primarily been assigned investigations dealing with the importation and distribution of illegal drugs, which includes cocaine, "crack" cocaine, heroin, fentanyl, marijuana, methamphetamine, crystal methamphetamine, and 3, 4-

methylenedioxy-methamphetamine (otherwise known as MDMA or "Ecstasy"). During those investigations, I have conducted physical surveillance, electronic surveillance, and wire surveillance. I have also arrested numerous individuals for various drug violations and have spoken with numerous drug dealers, gang members, and informants concerning the methods and practices of drug traffickers. These investigations have also included the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction, and the seizure of large amounts of U.S. currency; seizure of real property; and have involved the use of confidential informants; undercover agents; the analysis of pen registers, trap and trace devices, and toll records; physical surveillances and the execution of search warrants and arrest warrants. I have also testified in grand jury proceedings, suppression hearings, jury trials, and have written reports and analyzed documents in the course of investigations.

3. Based on my training and experience, I recognize that individuals involved in drug related activities often place assets, like cell phones, residences, storage units and vehicles, in names other than their own to avoid detection by law enforcement. Even though these assets are in other people's names, the offenders continue to use these assets and maintain control over them. I am also aware that these

individuals often utilize storage units to hide their illegal wares from law enforcement and that these storage lockers are often rented in other people's names. I am further aware that drug traffickers commonly use multiple cellular telephones to conduct their illicit activities. Said cellular telephones are often rotated and/or replaced with new cellular telephones on a regular basis in order to remain undetected by law enforcement.

4. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

5. The information in this Affidavit is based on my personal investigation and does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

6. On May 27, 2020, agents from the DEA Cincinnati Resident Office received information from a CS with the Columbus Airport Group that Justin White and Dominique Dixon were traveling from Cincinnati to Los Angeles (with connecting flights through Chicago and Phoenix) on a suspicious flight itinerary: their one-way airline tickets were purchased two (2) days before travel, and they were traveling to a known source city/state.

7. A search of criminal history for Justin D. White showed several drug related arrests from 2010-2014.

8. I responded to the departure gate accompanied by TFO Bernecker, Det. Moyer and Det. Bentley, to await the departure of American Airlines flight #3396 from CVG to ORD. Passengers began boarding the plane and Det. Moyer positioned himself behind the ticket agent so he (Det. Moyer) could observe the passenger's names as their boarding passes were being scanned. Once WHITE was identified, TFA Bernecker approached WHITE in the open area of the Jet-way where White was free to walk away at any time. TFA Bernecker identified himself as a Task Force Agent with the DEA and asked to speak with WHITE, and he responded "yes". TFA Bernecker then explained that he and the other officers belong to an interdiction group looking for weapons, narcotics, and large amounts of currency traveling through the airport. TFA Bernecker then asked if WHITE had any of those things on his person or in his luggage. WHITE stated "I do have money in my carry-on bag". TFA Bernecker asked WHITE how much money he was traveling with, and WHITE stated he had approximately $5,000.

9. TFA Bernecker asked WHITE what his purpose for travel was, and WHITE stated that he and his girl were going to hang out in Los Angeles and party. TFA Bernecker asked WHITE where he was staying, and WHITE stated he was grabbing a hotel.

10. TFA Bernecker asked WHITE what he did for employment and stated that he was in vehicle sales. TFA Bernecker asked WHITE if he had any kind of proof of his employment, and WHITE stated he did not. TFA Bernecker asked WHITE how long he has been selling cars and WHITE stated for about 1 year. TFA Bernecker

asked WHITE how much in taxes has he paid for 2019. WHITE advised TFA Bernecker that he has never paid taxes.

11. TFA Bernecker then asked for permission to search WHITE's person and carry-on bag. WHITE stated "yeah." TFA Bernecker did not find anything on WHITE's person. TFA Bernecker searched WHITE's carry-on and could smell a strong odor of marijuana coming from the bag. TFA Bernecker searched the checked bag in front of WHITE and started finding large stacks of U.S. Currency inside socks rubber banded together. The U.S. currency stacks contained a bunch of hundred-dollar bills. The U.S. Currency looked to be well over $10,000. TFA Bernecker asked WHITE why he lied about the amount of U.S. currency. TFA Bernecker advised that now agents wanted to make sure the U.S. Currency was not to be used for narcotics. TFA Bernecker asked WHITE if he had any kind of criminal history. WHITE inaccurately stated to the agents that he has never been in trouble.

12. TFA Bernecker asked WHITE if he used banks and if the money came from a bank. WHITE advised that he did use banks and the money was from Fifth Third Bank, it was from savings over the last year. TFA Bernecker asked WHITE when the last time was that he filed income taxes. WHITE stated he has been awhile. TFA Bernecker asked WHITE again for any kind of proof of income from car sales. WHITE could not show any kind of proof. TFA Bernecker asked WHITE if he any kind of banking proof. WHITE showed TFA Bernecker a Fifth Third bank app showing his account had $1,500.00 remaining in it. TFA Bernecker asked WHITE if he basically cleaned his account out, and WHITE stated he did. TFA

5

Bernecker asked WHITE why he needed so much money out in California and why such a late decision on travel. WHITE refused to answer TFA Bernecker.

13. TFA Bernecker asked WHITE if he could search his (WHITE'S) wallet. WHITE stated that he could but there wasn't anything in it. TFA Bernecker found two marijuana cards, one for Ohio and one for California. TFA Bernecker asked WHITE if he was going to use the money for marijuana in California. WHITE stated he was going to definitely buy marijuana and smoke in California and that it was legal. TFA Bernecker advised it was not legal federally. WHITE was traveling with Dominique J. DIXON who is a known drug trafficker with the DEA. Your affiant began talking to DIXON while TFA Bernacker was speaking to WHITE. I asked Dixon if I could conduct a search of her carry-on bag and purse. Dixon verbally consented to allow the searches. I located U.S. currency in Dixon's wallet which was inside her purse. Dixon said the U.S. currency in her wallet was about $6,000.00 dollars and that the U.S. currency was for food, clothes and entertainment while visiting in Los Angeles, CA. DEA did not seize the U.S. currency that Dixon was traveling with. No items of evidentiary value were located in Dixon's carry-on bag or purse.

14. TFA Bernecker asked WHITE if agents could look in his phone. WHITE stated there is no way he was letting cops search his phone. TFA Bernecker asked if there was anything tied to the sale of narcotics in the phone. WHITE advised that there was not, but he just didn't like the police. TFA Bernecker advised WHITE

that the phone was going to be collected for evidence and that officers would apply for a search warrant.

15. A Kentucky state search warrant was obtained for WHITE'S phone where messages were obtained regarding the buying and selling of marijuana.

16. After the seizure from WHITE, the currency was transported to the Airport Police Department to have the currency examined by Narcotic K-9 Officer Minter and his partner "Faith." The K-9 exam was performed utilizing circulated currency, tennis balls, DEA evidence bags, un-circulated currency, and the seized currency from WHITE. "Faith" only showed a positive indication for the presence of a narcotic odor on the currency seized from WHITE.

17. Several accumulating factors contributed to the officers' belief that there was probable cause that the cash was proceeds of drug-related activities, including:
    a. travel on a recently purchased (2 day) one-way airline ticket to a known source city/state;
    b. a criminal history that includes arrests for drug trafficking and investigation by other law enforcement agencies for involvement in drug trafficking;
    c. dishonesty about how much cash he was carrying;
    d. no proof of a legal source for the cash, including employment;
    e. admission to not filing taxes;
    f. messages on his phone indicative of drug trafficking;
    g. the strong odor of marijuana in his carry-on baggage; and
    h. positive indication by a drug dog.

7

For the above-stated reasons, your affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881 (a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true.

This 22 day of MAY, 2024.

Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration